Terrian SCOTT, Plaintiff,

v.

Donna E. SHALALA, Secretary of the Department of Health and Human Services, Defendant.

No. 94 C 4353.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 10, 1995.

Jeffrey A. Rabin, Jeffrey A. Rabin & Associates, Chicago, IL, for plaintiff.

Craig Arthur Oswald, United States Attorney's Office, Chicago, IL, for defendant.

*MEMORANDUM OPINION*

BRIAN BARNETT DUFF, District Judge.

This is a social security appeal under 42 U.S.C. § 405(g). The Plaintiff has moved for summary judgment on the basis of the record of the administrative hearing below. Plaintiff Terrian Scott ("Ms. Scott") appeals the ruling by the Secretary of Health and Human Services ("the Secretary") denying her disability insurance benefits. Ms. Scott alleges three grounds for reversing or remanding the case. First, she argues that the Social Security Administration's Administrative Law Judge ("ALJ") improperly admitted into evidence a consultative medical report that was not signed. Second, she argues that in reaching his conclusion of not dis-

abled, the ALJ failed to consider properly the reports of the treating physician and the Secretary's own medical advisor which were favorable to her claim of disability. Finally, she argues that the ALJ improperly substituted his own medical judgment regarding Ms. Scott's residual functional capacity for performing work for that of the physicians of record. Because we agree with the Plaintiff on all three of her grounds, we grant the Plaintiff's motion.

For the reasons discussed below, we remand the case to the ALJ to take evidence on whether Ms. Scott's symptoms of pain in her right shoulder and neck were supported by objective medical evidence based on medically acceptable clinical or laboratory diagnostic techniques. If such objective evidence is found, we further instruct the ALJ to develop and consider medical and other evidence which will allow the Secretary to evaluate the intensity and severity of the pain and how the pain would diminish her residual functional capacity.

## BACKGROUND

### I.   Procedural History

Ms. Scott was born on February 1, 1950. On June 28, 1987, while working at a home for mentally retarded adults, she hurt her hand. On that day, Ms. Scott was feeding a resident of the home. For a moment she turned her glance away, and the patient grabbed her thumb and pulled it toward her wrist. This caused substantial injury to her hand. Her thumb was splinted for one week and then placed in a cast for three weeks. (R. 223). Several months after the injury, on December 12, 1987, Ms. Scott had surgery on the right hand to release the right carpal tunnel.

On September 17, 1990, Ms. Scott applied for disability insurance benefits. The Secretary, through the Social Security Administration, denied her application for benefits, and she requested a hearing before an ALJ. The hearing occurred on December 18, 1991. On April 24, 1992, the ALJ ruled that Ms. Scott

was not disabled, and she appealed to the Appeals Council. The Appeals Council remanded the case to the ALJ to develop testimony of a vocational expert for determining whether substantial numbers of jobs existed in the local economy for a person with Ms. Scott's vocational characteristics and residual functional capacity for work. The second hearing occurred on August 13, 1993. On March 9, 1994, the ALJ ruled that Ms. Scott had the physical exertional capacity to perform light work; that her residual functional capacity was the capability to perform light work diminished only by the inability to make repetitive motions with her right hand; and that with her combination of vocational characteristics, she could perform a significant number of jobs that exist in the local economy. She has now appealed to the district court for review of the decision of the Secretary.

## II. Review of the Evidence

■ This case comes to us in the posture of an appeal. When reviewing the decision of the ALJ below, we must accept his findings if there was sufficient evidence on record that a reasonable mind might accept as adequate to support the same conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir.1994). "Although we review the entire record, we may not decide the facts anew, reweigh the evidence, or substitute our own judgment for that of the Secretary." *Herron*, 19 F.3d at 333 (quoting *Jones v. Shalala*, 10 F.3d 522, 523 (7th Cir.1993)); *see Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir.1994).

The record contains evidence from three doctors, Drs. Schenck, Stevens, and Markovitz, as well as the testimony of the claimant Ms. Scott and of the vocational expert Carl Triebold. It also contains the first and second ALJ opinions. A summary of our review of the entire record follows.

## A. Treating Physician Dr. Schenck

Dr. Schenck was Ms. Scott's treating physician hand specialist after her carpal tunnel surgery and beginning in February, 1988. The record contains his reports to her employer's worker's compensation office concerning her condition and her capacity for work. At his initial consultation, he noted that she complained of "pain in the thumb which shoots up the arm as far as the neck. It is mostly tender in the thumb but varies everywhere from the tip to the first dorsal compartment in the radial styloid area."[1] (R. 150). Her right hand grip strength varied from seven to ten pounds, while her left hand grip strength varied from twenty-five to thirty-five pounds. He indicated the use of a thumb spica splint, a Transcutaneous Electrical Nerve Stimulation (TENS) unit[2] for her right arm and shoulder, and Elavil 25 mg each night to control the pain symptoms. (R. 152).

Subsequent visits to Dr. Schenck followed. In April, 1988, he prescribed the use of a Jobst glove on Ms. Scott's right arm to help control the pain and swelling. (R. 153). He noted she was not capable of returning to light tasks at that time. On April 27, 1988, Dr. Schenck noted increase in grip strength but a continuation of pain symptoms. He added Naprosyn 500 mg to her list of medications to control pain. On June 1, 1988, Dr. Schenck noted her increase in discomfort in the upper arm and shoulder, and that she chose to use the TENS unit on her shoulder to control pain there. (R. 156). He added Amitriptyline 50 mg to her medication list to control pain. (R. 158). On June 29, 1988, Dr. Schenck noted no major change in her condition. On August 10, 1988, Dr. Schenck noted some improvement in her pain symptoms and grip strength. (R. 159). At the September 7, 1988, visit, Ms. Scott complained that the pain persisted in the form of shooting pains from her right long finger to her elbow, and up to her neck. The doctor wrote, "[t]he diagnosis of this patient is re-

---

1. Dorsal means "posterior." Styloid means "peg-shaped; denoting one of several slender bony [projections]." Radial means "relating to the radius (bone of the forearm)." *Stedman's Medical Dictionary* (1982) (Fifth Lawyer's Edition).

2. "A TENS (transcutaneous nerve stimulator) is an electrical device for the control of pain by blocking pain impulses traveling up the spinal cord to the brain. J.E. Schmidt, M.D., *Attorneys' Dictionary of Medicine* T–101 (1979)." (Def.Br. at 2 n. 1).

flex sympathetic dystrophy [3] which is causing her pain syndrome." (R. 160).

At the October 10, 1988, visit, her complaints of right shoulder and neck stiffness continued, including right neck spasms. (R. 162). Dr. Schenck reported the results of a functional capacities evaluation he commissioned for Ms. Scott: carrying capacity in the right hand was two to three pounds and in the left hand five pounds; hook grasp carrying in the right hand was two pounds and in the left six pounds; and bilateral carrying was five pounds. At her December 12, 1988, examination, the complaints of pain continued, and Dr. Schenck reported that certain of her pain medications gave her drowsiness and so were reduced. (R. 164). Her February 20, 1989, physical examination revealed moderate edema but no tenderness in the right hand, and that the TENS unit was helpful for her. On May 24, 1989, Dr. Schenck reported Ms. Scott's belief that the upper right extremity pain had decreased overall but was still present in the right neck and shoulder. At this examination, she reported developing triggering of the left thumb, and received an injection of cortisone for it. Dr. Schenck once again prescribed Elavil. (R. 166).

On October 13, 1989, Dr. Schenck noted that Ms. Scott continued to use the TENS unit for pain for eight hours per day. He opined that the results of her year-old func-tional capacities evaluation "would be essentially unchanged at this point in time," suggesting that carrying capacity had not improved. (R. 167). He continued to prescribe pain killing medications. The final examination by Dr. Schenck in the record occurred on October 22, 1990. He noted she was still wearing the thumb spica splint and that she continued to use the TENS unit. He noticed that her pain persisted. At this examination, Dr. Schenck also located a lesion on the "dorsal ulnar aspect of the right wrist." (R. 169). This lesion was found to be non-malignant and was surgically removed by another doctor on January 22, 1991.

### B. Medical Advisor Dr. Stevens

Dr. Stevens testified as a medical advisor to the Secretary at the December 18, 1991, hearing. He testified that based on his review of the medical record and his observations of the claimant at the hearing, Ms. Scott could lift with her right hand ten pounds occasionally, (R. 61), and with the left hand ten pounds occasionally, (R. 70). Using her right hand as an assist to her left, he believed she could lift ten pounds frequently or twenty pounds occasionally. (R. 61). He did not observe any atrophy of the right arm, which he testified would evidence total permanent disuse. (R. 60). He testified that doing some "residual things" during the day with that hand would keep those hand muscles working and unatrophied. (R. 71). He

3.  The reflex sympathetic dystrophy syndrome (RSDS) is characterized by pain and tenderness usually of a distal extremity accompanied by signs and symptoms of vasomotor instability, trophic skin changes, and the rapid development of bony demineralization. A precipitating event can be located in two-thirds of cases. These include local trauma.... An entire hand or foot is usually affected.... The pathogenisis of RSDS is poorly understood. The vasomotor manifestations are thought to be caused by abnormal stimulation of the sympathetic nervous system.

    \*   \*   \*   \*   \*   \*

    RSDS evolves through three clinical phases. The clinical manifestations of the first phase are pain and swelling of a distal extremity which develop weeks to months following the precipitating event. The pain has an intense, burning quality. The involved extremity is warm, edematous [swollen], and tender especially around joints. Increased sweating and hair growth occur. In 3 to 6 months, the skin gradually becomes thin, shiny, and cool (sec-ond phase). Clinical features of the first two phases overlap. In another 3 to 6 months, the skin and subcutaneous tissue become atrophic, and irreversible flexion contractures of the hand or foot develop (third phase). Motion of the shoulder on the affected side is frequently painful and greatly restricted, a condition referred to as *shoulder-hand syndrome*....

    \*   \*   \*   \*   \*   \*

    ... Bone scan in the early phase shows asymmetric and increased blood flow followed subsequently by increased radionucleide uptake in the periarticular bone of the involved side.

    \*   \*   \*   \*   \*   \*

    Early recognition and treatment are important to prevent permanent disability. RSDS may be reversible in its early phases.... While the disease can be reversed in stage 1, and sometimes in stage 2, once the patient is in stage 3, treatment is mainly symptomatic. *Harrison's Principles of Internal Medicine* 1707–08 (1994) (emphasis in original).

could give no opinion concerning a diagnosis of reflex sympathetic dystrophy as an objective medical cause of her pain because, he testified, "I don't have hard evidence in that file. You'd normally have to have bone scans showing lack of bone calcium.... And I don't see any evidence of that and I don't see any EMG [4]—current EMG or nerve conduction velocity studies in that file." (R. 61). Concerning gross and fine dexterity in the right hand, he testified, "[s]o basically, things that require gross and fine dexterity of the hand are limited in this instance." (R. 63). She would be able to do fingering only with her splint off and her TENS unit on to control the pain. (R. 64). In response to the question of whether he thought her complaints of pain in her right shoulder are credible, he replied, "I'm not denying the fact that she has pain." (R. 69).

### C. Consultative Examining Physician Dr. Markovitz

After this hearing and prior to the second hearing, Dr. Markovitz filed a consultative examination report on his thirty minute examination of Ms. Scott. He reported that she experiences constant pain and weakness in the right hand. Also, "[s]he does have fairly clear cut 'give way' weakness, involving essentially all of the musculature of the right upper extremity." (R. 258). He saw no evidence of wasting or fasciculation,[5] swelling or rash, and she had full range of motion in all joints in the right upper extremity. He wrote, "[t]here was some numb type of feeling on tapping over the median nerve at the right carpal tunnel, as well as sensitivity over the ulnar nerve in the right ulnar groove at the elbow." (R. 258–59). He saw

no convincing evidence of nerve, nerve root, spinal cord or brain pathology to explain Ms. Scott's symptoms....

Ms. Scott probably does have a very mild polyneuopathy [6] [sic] related to her

underlying diabetes. Obviously an EMG would be required to evaluate that further. Ms. Scott is right hand dominant, and all of these problems have seriously affected her ability to perform manual tasks.

(R. 259).

On January 9, 1993, the ALJ sent a follow-up questionnaire to Dr. Markovitz containing four interrogatories. In return, the ALJ apparently received a copy of the original letter with responses to the interrogatories written in cursive in the margins. The responses were nowhere signed or initialed. Numbers three and four follow:

3. If Ms. Scott's right hand is incapacitated as she alleges, would you have expected to observe wasting of the hand muscles; and, if so, does this fact raise any doubt in your mind concerning the validity of her complaints?

[written in the margin:] My conclusion was there was no damage.

4. If the answer to 3 is affirmative, exactly what do you mean when you state on page two of your report "... all of these problems have seriously affected her ability to perform manual tasks"?

[written in the margin:] Subjectively she felt these things were impossible to do with her pain!

(R. 269–70).

Ms. Scott's attorney timely objected to the use of these marginal responses by the ALJ on the ground that consultative reports must be signed and this was not. (R. 273); 20 C.F.R. § 404.1519n(e) (1994).

### D. Ms. Scott's Testimony

In addition to the medical professionals' information, the evidence also included Ms. Scott's testimony at her December, 1991, hearing. She testified in detail to the pain in her right upper extremity. She also testified

---

4. An electromyogram (EMG) is a "graphic representation of the electric currents associated with muscular action." *Stedman's Medical Dictionary* 451 (1982).

5. Fasciculation is the involuntary contraction or twitching of groups of muscle fibers. *Stedman's Medical Dictionary* 515 (1982).

6. Diabetic polyneuropathy is characterized by symptoms of "numbness, paresthesias, severe hyperesthesias and pain. The pain, which may be deep-seated and severe, is often worse at night. It is occasionally lancinating or lightning in type...." *Harrison's Principles of Internal Medicine* 1995 (1994).

that among her medications, she uses Tylenol No. 3 with codeine daily for pain. She noted that when "the pain is very persistent the medication [Tylenol No. 3] doesn't work." (R. 51–53). She testified that holding items weighing more than six to eight pounds or repetitive motions aggravate the pain in her hands. She goes grocery shopping, but uses her left hand to reach for items on the shelves. (R. 45). She does not like to drive because she can only use her left hand to do so, and the last time she drove was one month before the hearing but only for eight blocks. (R. 45).

### E. The ALJ's Opinions

In his first opinion, dated April 24, 1992, the ALJ stated in his Summary of the Evidence that Ms. Scott testified to experiencing no side effects from the Tylenol No. 3. (R. 227). He draws this inference apparently from the Q & A where he asked her, "Does it have any [e]ffects on you? Side effects?" and she responded, "No. It doesn't work. When the pain is very persistent, the medication doesn't work." (R. 53).

He summarized the medical advisor's, Dr. Stevens', testimony as follows:

Dr. Bernard Stevens, the medical expert . . . testified that there is no objective evidence in the record regarding claimant's alleged back pain or left hand/shoulder problems. According to the medical expert, claimant has no restrictions in using her left hand or shoulder. She can lift ten pounds frequently and twenty pounds occasionally with that hand. Her right hand has no limitations in fine or gross dexterity except she should not engage in such activity [sic] repetitively nor lift more than ten pounds occasionally.

(R. 226). As to Ms. Scott's daily activities, the ALJ stated, "[s]he could . . . still do 'light' cleaning work and drive. At the hearing claimant admitted she can take care of personal needs, cook occasionally, and go grocery shopping." (R. 229).

In the ALJ's second opinion, which incorporated by reference nearly all of the first opinion, the ALJ commented on the consultative medical examination by Dr. Markovitz and on the testimony of the vocational expert

required on remand, Carl Triebold. He interpreted Dr. Markovitz's reply to interrogatory 4 as indicating that "he based his assessment on claimant's physical ability to do work-related activities on claimant's subjective allegations." (R. 20). He goes on, "[t]he Administrative Law Judge believes claimant is exaggerating her impairments. If her subjective complaints of pain, weakness, numbness, etc. are true, then there would be evidence of muscle wasting. . . . Since claimant's credibility is lacking, it cannot be determined whether or not she actually has any impairment." (R. 20).

The ALJ made only one, passing, reference to the symptoms of right shoulder and neck pain contained in Dr. Schenck's treatment reports. The ALJ noted that at the October 10, 1988, visit, Ms. Scott "alleged also of having right shoulder/neck stiffness and 'spasm' [sic] of the right neck." (R. 224). He made no acknowledgement of the complaints of right shoulder and neck pain contained in Dr. Schenck's reports of February 17, 1988; June 1, 1988; September 9, 1988; December 14, 1988; and May 24, 1989. Nor did the ALJ comment upon Dr. Schenck's clinical opinion of October 13, 1989, that Ms. Scott's functional carrying capacity had not improved in a year beyond the five pound limit.

Also lacking in the record is any indication that "muscle wasting" or atrophy is a medically acceptable clinical diagnostic technique for establishing objective evidence that Ms. Scott experiences right shoulder and neck pain. The ALJ did not indicate that he evaluated the comments by Dr. Stevens that an EMG or a bone scan would be helpful for diagnosing reflex sympathetic dystrophy. He also did not indicate that he evaluated the comment by Dr. Markovitz that an EMG would be helpful for diagnosing diabetic polyneuropathy in her arms.

The ALJ reported the testimony of the vocational expert Triebold in response to the hypothetical question of what jobs in significant numbers would exist on the "light" level for a person of Mrs. Scott's educational level, experience, and age who has "a hand impairment preventing repetitive movements."

Based on this hypothetical, Triebold replied that 24,000 unskilled and semi-skilled jobs exist, including machine tender (3,000), gate attendant (1,000) and security officer (20,000). The ALJ concluded that Ms. Scott was not disabled because "claimant retains the residual functional capacity to perform light work existing in significant numbers in the economy." (R. 20).

## DISCUSSION

### I. Standard of Review

■■■ On Ms. Scott's motion for summary judgment, we review the entire record in analyzing the decision of the ALJ. *Herron*, 19 F.3d at 333. Our function is to review the action of the ALJ to discern whether he has based his decision on sufficient evidence and whether he has applied the law properly. We may not reweigh the evidence or substitute our own judgment for that of the ALJ. *Id.* However, where the ALJ has patently misconstrued the evidence, has based a finding on a record lacking sufficient evidence, or has misapplied the law, then we may vacate that decision and remand the case for a proper adjudication. *See Scivally v. Sullivan*, 966 F.2d 1070, 1075, 1078 (7th Cir.1992); *Young v. Secretary of Health and Human Services*, 957 F.2d 386, 392 (7th Cir.1992). We will not disturb findings based on credibility, unless they are patently wrong. *Luna*, 22 F.3d at 690. Nonetheless, where an issue involves objective inconsistency or inherent implausibility, a reviewing court is in as good a position as the court below for ascertaining the truth. *Dray v. Railroad Retirement Board*, 10 F.3d 1306, 1314 (7th Cir.1993).

■■ Also, where the ALJ rejects evidence favorable to the claimant, he must articulate sufficiently that he has at least considered that evidence. The ALJ possesses a statutory duty to review all of the evidence. *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir.1985). When the ALJ fails to mention rejected evidence, we must send the case back because we have no way of telling whether the ALJ has complied with his statutory duty. *See Id.* The court requires some "minimum level of articulation by the ALJ as to his assessment of the evidence . . .

in cases in which considerable evidence is presented by the claimant." *Id.* (citations omitted). Put another way, "[i]f a sketchy opinion assures us that the ALJ considered the important evidence and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Id.* In reviewing the evidence and considering important and uncontradicted medical evidence, an ALJ may not substitute its own medical judgment for that of the physicians who have presented evidence before it. *See Scivally,* 966 F.2d at 1077.

### II. Disability Claims under the Social Security Act

Quite obviously, a claimant must be "disabled" to qualify for disability insurance benefits. Less obviously, the claimant must establish such a disability under a lengthy regulatory scheme promulgated by the Secretary. Under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. § 1382 *et seq.,* a disabled individual is defined as one with the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.*

Analysis of a disability claim falls under a five step test contained within the Secretary's regulations. *See* 20 C.F.R. § 416.920(a)–(f) (1994). Both Ms. Scott and the Secretary agree that the present dispute centers around the fifth step in the test, the analysis of the claimant's remaining functional capacity for work. When an out of work claimant has a severe impairment that prevents her from returning to her former job, but that does not equal one of the severe impairments listed by the Secretary, she will be found disabled under the regulations if the Secretary cannot show that she is capable of performing work in the national econo-

my. *See Pope v. Shalala,* 998 F.2d 473, 477 (7th Cir.1993). At step five, the Secretary has the burden of showing that there are jobs that this particular claimant can perform with this particular set of physical impairments. *Id.*

### A. Residual Functional Capacity (RFC)

In attempting to meet this burden, the Secretary operates under detailed regulations designed to assess a claimant's occupational possibilities. The Secretary must comply with her own regulations until she changes them. *See Prince v. Sullivan,* 933 F.2d 598, 602 (7th Cir.1991). The Secretary's assessment at this fifth step is denoted as a residual functional capacity (RFC) analysis. 20 C.F.R. § 404.1545–1569. The Secretary first assesses the nature and extent of a claimant's physical limitations (the "physical exertional capacity"), including the remaining ability, if any, to walk, sit, stand, and lift or carry varying ranges of weights, either occasionally or frequently. 20 C.F.R. § 404.1545(b). Other physical requirements of work activity analyzed are pushing, pulling, reaching, handling, stooping, or crouching capacities.

The Secretary has developed five convenient categories to express the findings related to physical exertional capacities of claimants. These are sedentary, light, medium, heavy, and very heavy. These categories conform to their functional equivalents describing the physical requirements of listed jobs in the "Dictionary of Occupational Titles" and the "Occupational Outlook Handbook" published by the Department of Labor. 20 C.F.R. pt. 404, subpt. P, App. 2, § 200.00(b).

The Secretary also assesses the claimant's mental abilities and the claimant's environmental impairments, such as hearing or vision disorders, in carrying out her assessment of a claimant's RFC. 20 C.F.R. § 404.1545(c)–(d).

Finally, the Secretary must consider in her analysis of RFC the limiting effects of *all* of a claimant's impairments, even those that are not severe. "Pain or other symptoms may cause a limitation of function beyond that which can be determined on the basis of the anatomical, physiological or psychological abnormalities considered alone." 20 C.F.R. § 404.1545(e). The Secretary must consider both medical and nonmedical evidence in determining how the total limiting effects of pain will affect a claimant's RFC. 20 C.F.R. § 404.1529(c). Once the Secretary has established an RFC for a claimant, she considers it in light of vocational considerations (age, education, experience, etc.) to determine whether significant numbers of jobs might exist in the national economy that the claimant can perform. 20 C.F.R. § 404.1560(c); *see DeFrancesco v. Bowen,* 867 F.2d 1040, 1044 (7th Cir.1989).

To summarize, the Secretary establishes an RFC for a claimant which expresses the category of physical exertion in which she is capable of performing in a job, and which also indicates the manner in which other limiting factors such as pain might disqualify the claimant from functioning in an otherwise physically suitable job. The Secretary recognizes that there is a tremendous difference in the working world between the vocational opportunities of someone who can perform light work and experiences no pain doing it, and someone who can perform light work and experiences constant severe pain doing it.

### B. The Role of Pain Symptoms in the RFC Analysis

When the physical exertional abilities are not limited by pain or other symptoms, the Secretary consults a chart within the regulations to decide whether the claimant's physical exertional capacity in combination with the vocational considerations warrants a finding of "disabled" or "not disabled." *See* 20 C.F.R. pt. 404, subpt. P, app. 2 ("the Grid"); *Walker v. Bowen,* 834 F.2d 635, 641 (7th Cir.1987). In any case in which physical exertional capacity alone does not represent the claimant's true RFC, "full consideration must be given to all of the relevant facts of the case in accordance with the definitions and discussions of each factor in the appropriate sections of the regulations." 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(a); *see also Walker,* 834 F.2d at 641. In other words, where pain reduces significantly a

claimant's RFC, the ALJ must "get off their Grids" and assess on all the facts what jobs are reasonably available. *DeFrancesco*, 867 F.2d at 1044.

In *Pope v. Shalala*, 998 F.2d 473 (7th Cir.1993), the Seventh Circuit clarified the manner in which an ALJ must incorporate symptoms of pain into his analysis of a claimant's claim. In that case, the claimant injured her back and was denied disability benefits. The ALJ found that the claimant's subjective reports of pain were not credible, and therefore entitled to no weight in determining the severity of her pain, even though objective medical evidence appeared on the record supporting a finding that pain did exist. *DeFrancesco*, 867 F.2d at 1042–43. The Seventh Circuit affirmed the decision of the ALJ, but not before ruling that the ALJ had used the wrong legal standard in evaluating the claimant's subjective complaints of pain. *Pope*, 998 F.2d at 487.

■ The Seventh Circuit held that the Secretary's regulations squarely govern the ALJ's proper analysis of complaints of pain. *Id.* at 485. It added that the Secretary is bound to comply with her own regulations. *Id.* at 486. Those regulations provide a two step analysis for incorporating complaints of pain into an assessment of RFC. Where symptoms of pain comprise part of a claimant's claim of disability, the ALJ must make a threshold determination of whether such symptoms are supported by medically acceptable clinical or laboratory diagnostic techniques. According to the regulations, symptoms of pain "will not be found to affect [the] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present." 20 C.F.R. § 404.1529(b). At this threshold step, a claimant may not rely on non-medical evidence, such as testimony of family members or the claimant's own testimony of her limitations to establish the mere existence of pain. The claimant may only use appropriate objective medical evidence.

Once the claimant has established the existence of pain with appropriate medical evidence, however, the claimant may then present both medical and other kinds of evidence to establish the intensity and severity of the pain. 20 C.F.R. § 404.1529(c). It was at this step that the ALJ in *Pope* erred, by not taking into account the "other evidence," including the claimant's subjective complaints, to establish how her RFC might have been diminished by the intensity and severity of pain. *Pope*, 998 F.2d at 486; *see Dray*, 10 F.3d at 1313–14. As the regulations state, the Secretary "will not reject [a claimant's] statements about the intensity and persistence of [ ] pain ... solely because the available objective medical evidence does not substantiate [the] statements." 20 C.F.R. § 404.1529(c)(2).

Such other evidence for evaluating the intensity and severity of pain may include information provided by the claimant, the treating or examining physician, or other persons. 20 C.F.R. § 404.1529(c)(3). The Secretary must consider the claimant's daily activities; the location, duration, frequency, and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medication taken to alleviate the pain; treatment received other than medication for relief of pain; any measures otherwise used to relieve pain; and other factors concerning functional limitations and restrictions due to pain. 20 C.F.R. § 404.1529(c)(3)(i—vii); *see also Luna*, 22 F.3d at 691; *Pope* 998 F.2d at 485. The Secretary's letter ruling SSR 88–13 instructs ALJ's to make six specific findings regarding these weighing factors for evaluating how pain affects a claimant's RFC. *See Pope*, 998 F.2d at 485.

The purpose of this analysis—the threshold step establishing pain followed by a full consideration of the intensity and severity of the pain—is to help evaluate the claimant's residual functional capacity for work. The ALJ does not engage in a disembodied exercise. Rather, all of these considerations should go directly to determining whether the total limiting effects of pain might prevent the claimant from working in the national economy. 20 C.F.R. § 404.1545(e). When evidence favorable to the claimant supports either the existence or the intensity of the pain, the ALJ must provide some "minimum level of articulation" as to why the ALJ

rejected the evidence. *Stephens,* 766 F.2d at 287.

### III. Ms. Scott's Claim of Shoulder and Neck Pain

▮ Ms. Scott asserts that the Secretary failed to properly consider both the reports of the treating physician and the testimony of the medical advisor. (Pl.'s Br. at 12). She claims that the ALJ presented "merely a selective consideration of a few of Dr. Schenck's findings, and no discussion of the positive findings." (Id.). Ms. Scott lists Dr. Schenck's reports of swelling and tenderness of her thumb, her positive Finkelstein's test, positive axial compression test, positive axial distribution test, repeated complaints of pain, swelling and increased edema, moderate weakness and decreased sensitivity, decreased thumb motion, decreased right wrist flexion, and decreased right wrist extension, as well as Dr. Schenck's opinion that Ms. Scott could only perform five pounds of bilateral carrying. (Pl.'s Br. at 12–13).

The Secretary responds that the ALJ considered all the evidence including Ms. Scott's subjective complaints. (Def.'s Response at 8). She asserts that the ALJ reasonably found Ms. Scott's complaints of disabling right upper extremity pain unsupported by the record. (Id.).

Ms. Scott next alleges that "the Secretary rejected, without explanation, most of the testimony of Dr. Stevens, the medical advisor hired by the ALJ to explain the medical issues raised in this claim." (Pl.'s Br. at 13). She states in her brief that "Dr. Stevens testified that Plaintiff's fine and gross dexterity of the right hand are *very* limited. His opinion was that Plaintiff could not use her right hand or arm, except as an assist to her left. Dr. Stevens further opined that Plaintiff's reflex sympathetic dystrophy could cause Plaintiff's hand pain to radiate up to her shoulder, as she had testified." (Id.) (citations to record omitted).

The Secretary responds that the ALJ specifically relied on Dr. Stevens' testimony to reach a finding of "not disabled." She states that while Dr. Stevens did find fine and gross dexterity limited, it was only because she could not oppose her thumb while wearing a spica splint. (Def.'s Response at 9–10). Dr. Stevens testified that Ms. Scott could remove the splint and oppose her thumb if she continued to wear the TENS unit. (Def.'s Response at 10). Dr. Stevens noted an absence of swelling or atrophy in her right arm on the day of the hearing, and testified that Ms. Scott could lift ten pounds with both hands frequently and twenty pounds with both hands occasionally. (Id.). He further testified that Ms. Scott would only experience pain in the right hand with repetitive use. (Id.).

Ms. Scott's allegations apparently amount to a claim that the ALJ improperly assessed both Ms. Scott's physical exertional capacity and Ms. Scott's pain which amounted to a total limiting effect upon her physical exertional capacity. We take each of these allegations in turn.

### A. ALJ Evaluation of Ms. Scott's Physical Exertional Capacity

The ALJ found that as to physical exertional capacity, Ms. Scott was capable of performing "light work." According to the Secretary's regulations, light work is that which requires a person to lift no more than twenty pounds occasionally and no more than ten pounds frequently, among other physical requirements. 20 C.F.R. § 404.1567(b). We evaluate whether substantial evidence existed for the ALJ to have reached this conclusion.

Ms. Scott claims that the evidence shows that she did not have the capacity to lift more than five pounds, and that the ALJ overlooked this evidence. While she is correct that Dr. Schenck believed that Ms. Scott's carrying capacity was only around five pounds, based on her functional capacities evaluation, (R. 162, 167), she is not correct that the ALJ failed to consider this evidence. In his first opinion, he stated that according to a functional capacities evaluation commissioned by Dr. Schenck, she "could not do work requiring her to lift more than two pounds in her right hand or five pounds in her left hand." (R. 224). The ALJ was not required to accept this older capacity finding over the testimony of the medical expert, Dr. Stevens, who noted that Ms. Scott's bilateral

carrying capacity (with the right hand assisting the left) was no more than twenty pounds occasionally or ten pounds frequently. (R. 61).

Perhaps Ms. Scott alleges insufficient evidence for this finding because the ALJ apparently misstated Dr. Stevens' testimony. The ALJ incorrectly attributed these carrying capacities to Ms. Scott's left hand alone. (R. 226). But nonetheless, substantial evidence existed on the record to find that Ms. Scott possessed a lifting capacity with both hands sufficient to place her in the category of "light work" based on her physical exertional capacity. The ALJ fulfilled his statutory duty to review all of the evidence pertaining to physical exertional capacity, and absent clear error, we leave his finding untouched.

### B. ALJ Evaluation of Ms. Scott's Pain and Other Limiting Effects

■ Ms. Scott argues that the ALJ did not consider the evidence of her shoulder and neck pain, and this failure constitutes error. We agree. The ALJ did not properly comply with the regulatory two step framework in evaluating Ms. Scott's symptoms of right shoulder and neck pain. In the first step, he should have scrutinized Ms. Scott's allegations of shoulder and neck pain to determine whether there was any objective medical evidence to lend support to them. 20 C.F.R. § 404.1529(b); *Pope,* 998 F.2d at 485–86. The ALJ rejected Ms. Scott's testimony involving her pain symptoms by calling them "exaggerated." (R. 20). The only place in the ALJ's decision where he addresses the objective medical evidence provided by her treating physician Dr. Schenck is when he excerpts one of Dr. Schenck's reports as saying that Ms. Scott "alleged also of having right shoulder/neck stiffness and 'spasm' [sic] of the right neck."

This rewording of the report delicately avoids the use of the word "pain." Yet the record is replete with Ms. Scott's complaints to her medical professionals of shooting, sharp, incessant pain from her right hand to the right side of her neck, including at least five reports by Dr. Schenck that go unacknowledged in either of the ALJ's opinions.

Additionally, the ALJ failed to acknowledge that his own medical expert agreed that Ms. Scott was feeling pain in her right shoulder and right neck. (R. 69). The ALJ failed to perform his statutory duty of considering all of the evidence, including the evidence favorable to Ms. Scott that he rejected. *See Stephens,* 766 F.2d at 287.

Apparently, the ALJ relied on his own belief that in the absence of muscle atrophy, such complaints of pain can have no acceptable medical basis. (*See* R. 230). Although the record contains no indication by any medical professional that muscle atrophy necessarily accompanies disabling right shoulder and neck pain, the ALJ carefully elicited evidence by Drs. Stevens and Markovitz of their opinion on whether Ms. Scott's muscles had atrophied in her right arm. He also stated in his second opinion that "[i]f her subjective complaints of pain, weakness, numbness, etc. are true, then there would be evidence of muscle wasting." (R. 20).

■ The ALJ must consider Ms. Scott's subjective complaints of pain where medical signs, shown by *medically acceptable clinical or laboratory diagnostic techniques,* establish objective evidence that her symptoms are true. 20 C.F.R. § 404.1529. Where the ALJ relies on a medical theory to reject a claimant's subjective complaints of pain, he may rely only on medical evidence that exists in the record. *See Scivally,* 966 F.2d at 1076. The ALJ must resist the temptation to play doctor, including the temptation to use medical diagnostic techniques not shown to be acceptable anywhere in the record. *See Dray,* 10 F.3d at 1313; *Schmidt v. Sullivan,* 914 F.2d 117, 118 (7th Cir.1990).

Not only did the ALJ here fail to establish what might be a medically acceptable clinical or laboratory diagnostic technique for confirming Ms. Scott's complaints of right shoulder and neck pain, but he also seemed to substitute his own technique, cut out of whole cloth. We have no way of telling whether the absence of muscle atrophy precludes an objective medical finding of pain. As a reviewing court, we require the record to contain sufficient information for meaningful review. *See Stephens,* 766 F.2d at 287.

The record contains two possible diagnoses, made by medical professionals, of disorders which might cause Ms. Scott's right shoulder pain: reflex sympathetic dystrophy and diabetic polyneuropathy. The ALJ rejected reflex sympathetic dystrophy as a diagnostic sign of pain on the basis of the medical advisor's, Dr. Stevens', testimony that the medical record before him gave him no indication of whether this diagnosis was true. But Dr. Stevens was quick to point out that he only meant that the proper medical tests did not seem to have been performed—a bone scan or an EMG. (R. 61). He stated, "I don't have hard evidence in that file. You'd normally have to have bone scans showing lack of bone calcium.... And I don't see any evidence of that and I don't see any EMG...." (R. 61). He did not give a true medical opinion based on a full medical record. The ALJ did not articulate the hesitancy inherent in Dr. Stevens' testimony, and thus did not fulfill his statutory duty to consider all evidence favorable to the claimant. *See Stephens,* 766 F.2d at 287. The ALJ's reliance on his testimony to reject Ms. Scott's symptoms of pain was therefore clearly erroneous.

Nor did the ALJ follow up on the assessment made by Dr. Markovitz, the consultative examining physician. He believed that Ms. Scott might be suffering from diabetic polyneuropathy, which would be an objective medical sign establishing her right shoulder pain. On remand, the ALJ should establish whether Ms. Scott's subjective complaints of right shoulder and neck pain are established by medically objective accepted techniques. The ALJ should consider all medical reports which are favorable to her claim of right shoulder and neck pain. If he rejects the medical diagnoses of reflex sympathetic dystrophy or of diabetic polyneuropathy, he should explain on what grounds he has done so where the record does not contain results from a bone scan or an EMG. If the ALJ finds that an additional consultative medical examination is necessary to meet these requirements, the ALJ should order it under 20 C.F.R. § 404.1519.

Once the record indicates by objective medical evidence that pain exists, the ALJ should then take into consideration both medical and other evidence in applying SSR 88–13 to determine how the intensity and severity of the pain might diminish Ms. Scott's residual functional capacity for performing light work. *See* 20 C.F.R. § 404.1529(c). We note that once such pain is established as a substantial limiting effect on her RFC under 20 C.F.R. § 404.1545(e), the Grids will no longer apply to Ms. Scott's case. "Where any one of the findings of fact does not coincide with the corresponding criterion of a rule, the rule does not apply in that particular case and, accordingly, does not direct a conclusion of disabled or not disabled." 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(a). Therefore, at that stage, the Secretary might wish again to employ a vocational expert to make a determination of what jobs, if any, Ms. Scott can perform in the economy.[7]

Ms. Scott also claims that the ALJ was mistaken when he found that she could perform manipulations with her right hand requiring fine or gross dexterity. We agree. In his first opinion, the ALJ incorrectly recited the testimony of Dr. Stevens as "[h]er right hand has no limitations in fine or gross dexterity except she should not engage in such activity [sic] repetitively nor lift more than ten pounds occasionally." (R. 226). Dr. Stevens' actual testimony was that she could perform such manipulations in the absence of her thumb splint, but only while wearing her TENS unit for relief of pain while doing them. (R. 62–63). This was evidence favorable to Ms. Scott, and the ALJ gave no indication he fulfilled his statutory duty in considering it.

The ALJ gave no acknowledgment that operations involving gross or fine dexterity in her right hand, other than "repetitive" actions, would cause Ms. Scott pain. On remand, the ALJ should ascertain, under 20

---

7. The ALJ also made the implausible and unsupported finding that neither the pain relieving medication nor the TENS unit Ms. Scott was using for pain would create side effects diminishing her residual functional capacity. We simply note that Tylenol No. 3 contains codeine, and that the TENS unit is a battery powered device that apparently wraps around Ms. Scott's arm.

C.F.R. § 404.1529(c) and SSR 88–13, how Ms. Scott's residual functional capacity would be diminished below light work if she can only perform fine or gross dexterity work with her dominant right hand while wearing the TENS apparatus for pain relief.

### IV. Admission of an Unsigned Report

■ Ms. Scott asserts that the response to the ALJ's interrogatories by Dr. Markovitz, the consultative examining physician, constituted an unsigned report and that therefore it should be excluded from evidence. She claims such reports must be personally signed by the examining physician, and that unless a report is signed, the Secretary may not use it to deny a claimant's claim of disability. (Pl.'s Br. at 11–12). The Secretary responds that the regulations permit follow-up responses to be made, and that such a response need not be signed unless it is a "report." She claims that these follow-up responses do not constitute a report and therefore need not be signed.

■ We agree with Ms. Scott. The follow-up responses constitute a report and needed to have been signed for the ALJ to consider their contents. The regulations are clear if the follow-up responses constitute a report: "[The Secretary] will not use an unsigned or improperly signed consultative examination report to make the determinations or decisions specified in paragraphs (b)(1), (b)(2), (b)(3), and (b)(4) of this section." 20 C.F.R. § 404.1519o(b). Paragraph (b)(1) is "denial." Id. The Secretary is bound to follow her own regulations. Pope, 998 F.2d at 486.

Are the follow-up responses a report? The regulations provide that if the original consultative examining report is incomplete or inadequate, the Secretary will "ask that the physician or psychologist furnish the missing information or prepare a revised report." 20 C.F.R. § 404.1519p(b) (emphasis added). The disjunctive might imply that follow-up responses are not a report. However, under the heading "Signature Requirements," the regulations state, "[a]ll consultative examination reports will be personally reviewed and signed by the physician or psychologist who actually performed the examination." 20

C.F.R. § 404.1519n(e) (emphasis added). Under 20 C.F.R. § 404.1519n, there are "complete" consultative examination reports, and there are "incomplete" ones. The signature requirement does not distinguish between the two. In both instances, all reports must carry the proper signature, because "[t]his attests to the fact that the physician or psychologist doing the examination or testing is solely responsible for the report contents and for the conclusions, explanations or comments provided...." 20 C.F.R. § 404.1519n(e).

Ms. Scott's concern about admitting the unsigned follow-up interrogatories rests squarely within the policy of the regulations, to insure that the one giving the responses is the physician who actually performed the examination. On the face of the document, we cannot tell who scribbled the replies in the margins. We furthermore find those responses wanting in clarity and we question how the ALJ could have evoked from them the inferences he did. The response to question three, "[m]y conclusion was there was no damage," does not seem to address directly the ALJ's query about Dr. Markovitz's expectations concerning muscle atrophy. The response to question four is no less equivocal. (See R. 269–70). We think that this follow-up reply to the ALJ's interrogatories constitutes an incomplete report, and therefore should have been signed. It was error for the ALJ to rely on it in denying Ms. Scott's claim.

### CONCLUSION

For the foregoing reasons, we remand this case for further proceedings consistent with this opinion. The ALJ should develop and consider the evidence on Ms. Scott's symptoms of pain in her right arm, shoulder, and neck to evaluate her residual functional capacity in a manner consistent with the Secretary's regulations.