Janice SCIVALLY, Plaintiff–Appellant,

v.

Louis W. SULLIVAN, M.D., Secretary of Health and Human Services, Defendant–Appellee.

No. 91–1030.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 1, 1991.

Decided May 20, 1992.*

---

* This appeal was originally decided by an unreported order on May 20, 1992. See Circuit Rule 53. The Court has subsequently decided to issue the decision as a fully citable published opinion.

Janet F. Gerske, Chicago, Ill. (argued), for plaintiff-appellant.

Carol A. Davilo, Asst. U.S. Atty., Office of U.S. Atty., Crim. Div., Gary A. Sultz (argued), Dept. of Health and Human Services, Region V, Office of Gen. Counsel, Chicago, Ill., for defendant-appellant.

Before CUDAHY, RIPPLE and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

On November 11, 1986, a semi-trailer truck rear-ended and side-swiped a car driven by Janice Scivally. The accident aggravated pre-existing lower back problems experienced by Ms. Scivally. Ms. Scivally applied for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* The Social Security Administration denied Ms. Scivally's application for disability benefits. She appeals the denial, specifically challenging the determination that she retained the residual functional capacity (RFC) to perform light work in a significant number of jobs in the national economy.

## I. FACTS

### A. Proceedings Before the ALJ

Ms. Scivally applied for disability benefits on June 3, 1987, alleging that she became disabled due to the car accident on November 11, 1986. Ms. Scivally's application was initially denied, as was her request for reconsideration. The appellant requested a hearing before an Administrative Law Judge (ALJ). A myriad of evidence was presented to the ALJ at the hearing which was held on April 8, 1988. This evidence consisted of Ms. Scivally's testimony, medical evidence and the testimony of a vocational expert.

### 1. Ms. Scivally's Testimony

Ms. Scivally was fifty-three years old at the time of the hearing. Her education ended upon completion of the eighth grade. Prior to the November 11, 1986 accident, Ms. Scivally worked as a forklift operator and a salad packer. She testified that she experienced lower back pain prior to the car accident, but the accident aggravated the condition. The claimant testified that she no longer did any heavy housework, including vacuuming, mopping, grocery shopping or laundry. She is able to take a shower and to dress herself. Ms. Scivally stated that she can sit only for short periods. After about thirty minutes of sitting, she gets up and walks around to ease the pain and tension caused by sitting, often doing light housework such as dusting. The claimant also testified that, pursuant to doctor's orders, she usually walks about a mile and a half each day, and, if the weather is nice, she walks an additional mile in the afternoon. Ms. Scivally explained that her pain increases when she sits, walks or bends. At the time of the hearing, she took Advil for the pain, having recently discontinued the use of Motrin because it caused stomach upset. Finally, Ms. Scivally testified that she experienced ringing in her ears, which was partially corrected by a hearing aid.

### 2. Medical Evidence

#### a. Central DuPage Hospital

Ms. Scivally was examined in the emergency room of Central DuPage Hospital following the November 11, 1986 accident. Ms. Scivally complained of pain in her lumbar spine radiating into her buttocks. She did not experience tingling or numbness, and she had a full range of spinal motion. Ms. Scivally had paralumbar tenderness, and medical personnel diagnosed paraspinal strain.

On November 19, 1986, X-rays taken of her spine showed straightening of the normal lumbar lordosis, anterolateral spurs at several levels, a narrowing of the L5–S1 disc space and slight demineralization of the bones. A comparison with 1983 X-rays disclosed a progressive change in her degenerative arthritis. A CT scan performed

at the hospital on December 17, 1986, revealed that:

> There are six lumbar vertebral bodies. There are hypertrophic and degenerative changes of the facet joints. There are small, bony spurs in combination with bulging disc at the level of L5–6. There is narrowing of the neural foramen at the level of L4–5 on the left, and L6–S1 bilaterally. There is a vacuum phenomenon at the level of L–4, 5 and L–5, 6.

Ms. Scivally also participated in two sessions of physical therapy at Central DuPage Hospital. During the first session, in December, 1986, she reported lower back pain that increased upon sitting or bending, and she occasionally experienced pain in her buttocks. The therapist noted a right lateral shift while standing, a slightly decreased lordosis, minimal limitations to spinal flexion and extension, normal muscle tone, strength and sensation. A discharge report prepared on January 6, 1987, noted that Ms. Scivally's pain had not decreased, although a lumbar roll made sitting more comfortable. Her trunk motion flexion and extension were within normal limits, but she experienced pain at the end of the range and when returning to a standing position. There was a slightly decreased lordosis, but the lateral shift had been corrected. The therapist's goals were partially met, but it was noted that the patient showed little improvement from the physical therapy.

Ms. Scivally again received physical therapy between January 26 and February 18, 1987. She continued to complain of lower back pain, with no improvement after the earlier physical therapy session. The therapist noted a slight scoliosis convex to the right lumbosacral region and decreased lumbar lordosis. The claimant experienced limited loss of motion of flexion to the ankles, moderate loss of motion on extension and minimal loss of motion on rotation. After several appointments, which produced no improvement of her lower back pain, the therapist suggested the use of a TNS (transcutaneous electrical nerve stimulation) unit to help decrease the pain. Ms. Scivally did report some improvement after using the TNS. The discharge report stated that the therapist's goals were met. While noting little decrease in the lower back pain, the therapist reported increased activity level, minimal loss in trunk motion, unremarkable gait, decreased lumbar lordosis, which had improved since the first appointment, improved posture, mild scoliosis and normal lower extremity strength.

b. Dr. Willard O. Elyea, M.D.

In a letter dated April 14, 1987, Dr. Elyea, Ms. Scivally's physician, summarized his treatment of the claimant. He first treated her on November 18, 1986. X-rays showed a narrowing of the L5–S1 disc space, as well as osteoporosis and degenerative arthritis. Dr. Elyea explained that he had prescribed Tolectin DS for Ms. Scivally shortly after the accident. He changed this prescription to Clinoril 200mg on November 24, 1986. Dr. Elyea treated Ms. Scivally again on December 8 and 29, 1986, and on January 19, February 19 and April 3, 1987. The letter indicated that Ms. Scivally was seen by Dr. Imana, a neurosurgeon, for her pain. In Dr. Imana's opinion, the cause of the pain was degenerative arthritis, which was aggravated by the accident. Dr. Elyea's letter concluded:

> The patient at this point is unable to work at her present job because she has limited capacity for the function of her lumbar spine. The diagnosis remains Degenerative Arthritis, Osteoporosis, and Trauma to the Lumbar Spine. Because of the extensiveness to her disease [sic] it is highly doubtful that this patient will be able to return to any position that requires long standing, sitting for prolonged periods of time, any heavy lifting or any abnormal position for her back and anything that requires strength in her lower extremities.

On June 18, 1987, Dr. Elyea completed a spinal disorder form for the Bureau of Disability Determination Services (BDDS) based on his most recent examination of the claimant on May 26, 1987. The report indicated that Ms. Scivally experienced pain in the lower back and neck, that her reflexes were "OK" and that there was no sensory loss or atrophy. He also noted that Ms.

Scivally walks unassisted. The claimant's range of motion in the lumbosacral spine was limited. Her flexion measured 75 degrees and the extension measured 10 degrees.[1] The physician also noted paravertebral muscle spasms in both the cervical and lumbosacral spine with decalcification of the lumbosacral spine. When questioned about possible nerve root compression, the doctor noted that the straight leg raising test was positive on the left at 60 degrees. He diagnosed Ms. Scivally's condition as degenerative disease at multiple levels of the spine and osteoporosis. In response to a question concerning Ms. Scivally's ability to perform work-related activities, Dr. Elyea wrote "unable to operate forklift."

On September 14, 1987, Dr. Elyea filled out a physical capacities evaluation on behalf of Ms. Scivally. In this report, he stated that the claimant could sit, stand or walk for one hour at a time, and for a total of two hours over an eight hour day. The evaluation also indicated that Ms. Scivally could not bend at all and could occasionally squat, crawl, climb, reach and lift up to ten pounds. According to Dr. Elyea, Ms. Scivally was totally restricted from driving automotive equipment, moderately restricted from exposure to marked changes in temperature and humidity and mildly restricted for unprotected heights, being around moving machinery and exposure to dust, fumes and gases.

The BDDS obtained a telephone report from Dr. Elyea on September 21, 1987. The doctor stated that he last examined Ms. Scivally on August 22, 1987. He noted that she experienced some stomach discomfort from her pain medication, but the condition was not severe. In reference to her back problems, the doctor reported:

> Her back condition is not getting any better. She has flexion of 45 degrees and 10 degree extension. This occurs with pain. She also has mild cervical spondylosis which causes her some pain. She also has pain from her osteoporosis of the spine. The pain that she describes is not more than what would be expected

for someone with her conditions. She takes Advil and Motrin for her pain which controls it pretty well. As long as she does not try to do any heavy work. [sic] She is able to walk without any assistance.

c. Dr. Thomas W. McNeill, M.D.

On Dr. Elyea's recommendation, Ms. Scivally was examined by Dr. McNeill, an orthopedic consultant on March 25, 1987. He reported some limitation in the motion of her spine at the extremes. He discovered tenderness and spasms in her lower back and a flattening of her normal lumbar lordosis. Dr. McNeill received X-rays which revealed a multi-level degenerative disease in the lower lumbar spine with disc bulging. He noted that Ms. Scivally's reflexes, motor power and sensation were normal, and that there were no protrusions or significant neuroforaminal stenosis. He diagnosed osteoporosis, arteriosclerotic peripheral vascular disease involving feet, secondary to smoking, and degenerative disease at multi-levels of the lumbar spine. He recommended the use of anti-inflammatory medication, physical therapy with heat, ultrasound and massage and the use of a LS corset. Dr. McNeill did not think surgery "would be a reliable treatment at the present time." Dr. McNeill also administered a "low back pain evaluation profile." He concluded that Ms. Scivally exhibited an atypical pain profile, but that the pain score was within normal limits, consistent with the organic findings.

Dr. McNeill saw Ms. Scivally again on May 3, 1987. He completed a spinal disorder report for the BDDS. He reported motion limitations in both her cervical spine and lumbrosacral spine with a paravertebral muscle spasm in the cervical spine. With reference to the patient's ability to perform work-related activities, Dr. McNeill stated that Ms. Scivally needed physical therapy for acute spinal pain and that she was unable to repeatedly bend, lift or twist.

---

1. The normal range of motion is 90 degrees for flexion and 10 degrees for extension.

### d.  Dr. Robert A. Stone, M.D.

Dr. Stone, an orthopedic surgeon, examined the claimant on March 11, 1988. He reported that flexion was 75 degrees and that the straight leg lift was limited to 70 degrees for the right leg and 65 degrees for the left leg, causing back pain at these limits. He also detected tenderness and palpitation associated with muscle spasms. He examined X-rays and noted arthritic changes, a narrowing of the disc spaces, bony spurring and sclerosis. He also detected a disc herniation. He advised taking anti-inflammatory medication and an exercise program. He also recommended "conservative management" noting that Ms. Scivally would continue to experience residual difficulties with her lumbar spine.

### e.  Dr. William G. Fischer, Ph.D.

Dr. Fischer testified at the hearing, at the ALJ's request, as a vocational expert. Dr. Fischer stated that he had listened to Ms. Scivally's testimony and reviewed the exhibits. The ALJ asked the following question: "Assume the claimant were capable of a level of light work, but that she should bend only occasionally, and she should not work in a noisy environment. Okay. Would this reduce the number of these jobs [1,600 separate sedentary and light unskilled occupations in the national economy] or these occupations?" Dr. Fischer responded that he did not think that those limitations would significantly reduce the number of jobs available. Dr. Fischer named several categories of jobs that he thought would be available within the limitations noted by the ALJ: sorting, assembly, inspection and packing jobs. He also testified that in most of these jobs, the individuals are confined to one work station and are not allowed to leave for significant periods of time. Finally, Dr. Fischer stated that all jobs require some degree of bending, so that if an individual were completely precluded from bending, all jobs would be eliminated.

### 3.  ALJ's Decision

On August 22, 1988, the ALJ concluded that Ms. Scivally had established that she has severe degenerative changes of the spine and mild hearing loss,[2] however, these impairments do not equal a disability listed in 20 C.F.R. Part 404, Appendix A, Subpart P. The ALJ also determined that the medical evidence submitted by the various physicians did not support their conclusions as to the claimant's physical limitations. The ALJ specifically discredited Dr. Elyea's reports as contradictory. The ALJ further held that Ms. Scivally's complaints of pain were not supported by clinical signs and findings and that her allegations were inconsistent with her physical activity. The ALJ found that, except for Ms. Scivally's inability to bend frequently and work in a noisy environment, she retained residual functional capacity to perform light, unskilled work. Based on the vocational expert's testimony, the ALJ found that there were 5,000 qualifying jobs available in the Chicago area. The ALJ concluded:

> Based on an exertional capacity for light work, and the claimant's age, education, and work experience, section 404.1569 and Rule 202.10 and 202.11, Table 2, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

### B.  Proceedings Before the Appeals Council

Ms. Scivally timely requested review of the ALJ's determination before the Appeals Council, presenting additional evidence for consideration. She submitted a report from a Magnetic Resonance Scan taken on June 10, 1988, which showed that there was "probably" a small herniated disc at the L4-5 level. In addition, the picture identified a small bony spur at the L5-6 level with minimal compression on the thecal sac. A report from Dr. Irving C. Sherman, who examined Ms. Scivally on September 2, 1988, was also submitted. Dr. Sherman stated that her back displayed

**2.**  Ms. Scivally also submitted evidence about her hearing difficulties. Because the parties do not dispute the existence of this condition or that

the condition would place some limitation on her work environment, this evidence need not be discussed.

a full range of motion, but that extreme motion aggravated her lower back pain. Although he found no objective evidence of neurological defect, he stated that she did have a significant organic lesion impairing the mobility of her spine. He noted the degenerative conditions found by other medical personnel. He concluded that she could not perform her prior job, and opined that she could not perform any job involving physical activity with any consistency, projecting that Ms. Scivally could become a total invalid if required to do so. Finally, Ms. Scivally submitted a vocational evaluation prepared by Susan A. Entenberg, M.A. Ms. Entenberg based her opinion on the medical reports from Dr. Elyea, Dr. McNeill, Dr. Stone and Dr. Sherman, in addition to reading the ALJ's decision and Ms. Scivally's Post–Hearing Brief. Ms. Entenberg concluded that Ms. Scivally could not perform any jobs in the national economy on a substantial basis.

On May 22, 1989, the Appeals Council notified Ms. Scivally that her request for review was denied and that the ALJ's decision would stand as the final decision of the Secretary. The Appeals Council noted that the medical evidence showed only minimal compression on the thecal sac and the bulging or herniated disc was not significant. The Council also emphasized Dr. Sherman's observation that there was no objective evidence of organic neurological deficit. The Appeals Council concluded that no evidence supported Ms. Entenberg's conclusion that Ms. Scivally was unable even to engage in a full range of sedentary work due to the need to walk at will.

Ms. Scivally filed suit in the district court pursuant to 42 U.S.C. § 405(g) for judicial review of the Secretary's decision. The

district court concluded that substantial evidence supported the Secretary's denial of benefits.

## II. ANALYSIS

■ The Social Security Act, 42 U.S.C. § 405(g), requires the Secretary's findings to be sustained if supported by substantial evidence. Therefore, we will reverse the Secretary's findings only if they are not supported by substantial evidence or if the Secretary applied an erroneous legal standard. *Pugh v. Bowen*, 870 F.2d 1271, 1274 (7th Cir.1989). Substantial evidence is only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pitts v. Sullivan*, 923 F.2d 561, 564 (7th Cir.1991) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)). This court cannot "decide facts anew, reweigh the evidence, or substitute our own judgment for that of the Secretary." *Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir.1989) (quoting *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir.1986)). When the Appeals Council denies review and concludes that the ALJ's decision is final, the court reviews the ALJ's determination as well as any new evidence which the Appeals Council may have found to be immaterial. *Nelson v. Bowen*, 855 F.2d 503, 505 (7th Cir.1988).

Ms. Scivally challenges the ALJ's rejection of the objective medical evidence submitted by her doctors and the conclusion that her complaints of pain are not substantiated by clinical signs and findings.[3] She argues that the ALJ's determination that she could perform light work is not supported by substantial evidence. She further contends that the Secretary failed to

---

**3.** 20 C.F.R. § 404.1528 provides:

Medical findings consist of symptoms, signs, and laboratory findings:

(a) *Symptoms* are your own description of your physical impairment. Your statements alone are not enough to establish that there is a physical or mental impairment.

(b) *Signs* are anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques....

(c) *Laboratory findings* are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiograms, electroencephalograms, etc.), roentgenological studies (X-rays), and psychological tests.

meet his burden of showing other work that Ms. Scivally could perform.[4]

### A. The Medical Evidence

■ The ALJ must minimally articulate his reasons for crediting or rejecting evidence of disability. *Steward v. Bowen,* 858 F.2d 1295, 1299 (7th Cir.1988).[5] The Secretary's decision must be based on testimony and medical evidence in the record, and the Secretary "cannot make his own independent medical determination about the claimant." *Rousey v. Heckler,* 771 F.2d 1065, 1069 (7th Cir.1985). The Secretary determined that Ms. Scivally retained the residual function capacity to perform light work with the added limitations that she could only occasionally bend and could not work in a noisy environment.[6] In making this assessment, the Secretary rejected the limitations placed on the claimant by several of the doctors that examined her. The Secretary determined that the limitations articulated by her physicians were not supported by objective medical evidence and that certain reports were internally inconsistent.

The Secretary justified his rejection of the physicians' conclusions by stating that the reports were inconsistent. The ALJ specifically discredited Dr. Elyea's functional capacity evaluation dated September 14, 1987, in which the doctor concluded that

Ms. Scivally could not bend and could only occasionally squat, crawl, climb, reach and lift ten pounds. The ALJ found this to be inconsistent with a subsequent telephone report of September 21, 1987, in which the doctor noted that Ms. Scivally experienced a normal level of pain, which she could control fairly well by taking Advil and Motrin and by refraining from heavy work. In an earlier report, written on April 14, Dr. Elyea had previously concluded that Ms. Scivally could not return to any position requiring long periods of standing or sitting, or heavy lifting or abnormal back positions. This report is consistent with the September 14 evaluation.

Although the two September reports are not entirely consistent, the different formats of the reports account for the alleged inconsistencies. The September 14 report consisted of a written questionnaire asking for specific evaluations. Dr. Elyea's comments in the telephone report were made in response to the general question: "Can you comment on her back condition?" Dr. Elyea's general answer that the claimant could not perform heavy work does not negate his earlier fact-specific answers, nor does it allow the ALJ to infer that Ms. Scivally was precluded only from performing heavy work. This evidence does not support the ALJ's conclusion that Dr.

---

4. Ms. Scivally does not challenge the ALJ's determination that her back problems do not equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, Subpart P, §§ 1.00–1.13. She challenges the ALJ's conclusion that she could perform light work, arguing that she is capable only of performing sedentary work. Under the regulations, Ms. Scivally, based on her age, education and past work experiences, would be found to be disabled if she were limited to sedentary work. 20 C.F.R., Part 404, Appendix 2, Subpart P, § 201.00(g).

5. This is particularly important when there is nothing contradicting the evidence presented. *Look v. Heckler,* 775 F.2d 192, 195 (7th Cir. 1985); *Rousey v. Heckler,* 771 F.2d 1065, 1069 (7th Cir.1985). The record does contain two residual functional capacity evaluations prepared by Dr. H.G. Woody. The second assessment states that Ms. Scivally's only limitations are that she cannot lift over twenty pounds and can stoop only occasionally. Dr. Woody's reports mention the pain experienced by Ms. Sci-

vally. However, neither the ALJ nor the Appeals Council discussed this potentially conflicting evidence. As such, it cannot be considered as the basis for denying benefits because the Secretary did not expressly credit or reject this evaluation.

6. 20 C.F.R. § 404.1567(b) defines light work:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

Elyea's reports should be rejected as "totally in contradiction with each other."

Consistent with Dr. Elyea's diagnosis, Dr. McNeill's May 13, 1987, spinal disorder report found that Ms. Scivally could not repeatedly lift, twist or bend. The ALJ found that the limitations described by Dr. McNeill could not be produced by Ms. Scivally's documented medical conditions. However, the ALJ did not rely upon any medical report or opinion to support this conclusion. Without such contradictory evidence, the ALJ impermissibly substituted his own medical opinion for that of Ms. Scivally's physicians.

The ALJ also discredited Dr. Stone's report of March 1, 1988, because Dr. Stone detected a herniated disc. The ALJ believed this to be inconsistent with other physicians' reports as well as Dr. Stone's notation that Ms. Scivally's reflexes, strength and sensations were intact. Again, however, the ALJ did not cite to any medical evidence to support this opinion. Consistent with Dr. Stone's finding, the report on the Magnetic Resonance Scan, which was included in the evidence subsequently presented to the Appeals Council, noted the possibility of a herniated disc.

The ALJ also stated that Ms. Scivally's activities were inconsistent with the limitations prescribed by the physicians. In this regard, he noted her ability to walk a mile and a half per day. The ALJ does not explain why he believes this activity is inconsistent with Dr. Elyea's assessment that Ms. Scivally could walk, stand or sit for more than one hour at a time for a total of no more than two hours out of every eight hours.

All of the physicians' conclusions concerning Ms. Scivally's physical limitations were much more restrictive than the ALJ's conclusion. Moreover, there is no medical evidence or opinion in the record upon which the ALJ relies to contradict these conclusions. The ALJ apparently based his conclusions on specious inconsistencies. In the absence of contradictory medical evidence, the ALJ impermissibly substituted his own medical judgment for that of the physicians. In addition, as will be discussed, the ALJ completely disregarded Ms. Scivally's complaints of pain, an omission which may affect his view of the limitations diagnosed by the doctors.

### B. Subjective Complaints of Pain

The Secretary must consider a claimant's subjective complaints of pain if supported by medical signs and findings. *Veal v. Bowen,* 833 F.2d 693, 698 (7th Cir.1987); *Walker v. Bowen,* 834 F.2d 635, 641 (7th Cir.1987). "A claimant's statement of symptoms is not sufficient to establish the existence of an impairment; some objective evidence should be present." *Stuckey v. Sullivan,* 881 F.2d 506, 508 (7th Cir.1989).[7]

The ALJ found that "[t]he claimant's allegations of pain and limitations are inconsistent with her activities and are not substantiated by clinical signs and findings." We have determined that the ALJ's rejection of the medical evidence is unsupported. Therefore, the ALJ's dismissal of Ms. Scivally's complaints of pain as not supported by clinical signs and findings is equally unsustainable. At no point did the ALJ or the Appeals Council find that Ms. Scivally's severe impairment, severe degenerative alteration of the spine, could not be reasonably expected to produce pain. *See* 20 C.F.R. § 404.1529. Indeed, Ms. Scivally's medical records are replete with references to complaints of pain and treatment plans designed to reduce that pain. Both

---

7. 20 C.F.R. § 404.1529 provides:

If you have a physical or mental impairment, you may have symptoms (like pain, shortness of breath, weakness or nervousness). We consider all your symptoms, including pain, and the extent to which signs and laboratory findings confirm these symptoms. The effects of all symptoms, including

severe and prolonged pain, must be evaluated on the basis of a medically determinable impairment which can be shown to be the cause of the symptom. We will never find that you are disabled based on your symptoms, including pain, unless medical signs or findings show that there is a medical condition to produce those symptoms.

Dr. Elyea and Dr. McNeill made specific findings that Ms. Scivally's pain was within the normal range expected for a person with her ailments. The Secretary's failure to consider Ms. Scivally's complaints of pain is error.

### III. CONCLUSION

The medical records reveal that Ms. Scivally suffered from osteoporosis, degenerative arthritis disease, disc bulging which possibly developed into a herniated disc, narrowing of the disc spaces, bony spurs and muscle spasms, resulting in minimal to moderate limitation of motion in the spine. There was no evidence presented which suggested that these conditions would not result in the limitations identified by the physicians or produce pain which could affect Ms. Scivally's physical limitations.

The ALJ found that Ms. Scivally retained the residual functional capacity to perform light work, and thus concluded that she was not disabled. Because we believe that the ALJ improperly disregarded objective medical evidence of Ms. Scivally's limitations, as well as her complaints of pain, further proceedings are necessary to determine Ms. Scivally's residual functional capacity.

The judgment of the district court is VACATED and the case is REMANDED to the Secretary for further proceedings as above-indicated.