124 F.3d 204
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Callie Hubbard-DAVIS, Plaintiff-Appellant,
v.
John CALLAHAN, Defendant-Appellee.
 No. 96-4202.
 United States Court of Appeals, Seventh Circuit.
 July 17, 1997.
 
 Before POSNER, Chief Judge, and MANION and ROVNER, Circuit Judges.
 
 
 1
 Appeal from the United States District Court for the Northern District of Illinois, Eastern Division, No. 95-C-5556; Ronald A. Guzman, Magistrate Judge.
 
 ORDER
 
 2
 The Social Security Administration ("SSA") denied Callie Hubbard-Davis' application for Supplemental Security Income ("SSI") because, it found, she was not "disabled" as that term is defined under the relevant statutes and regulations. After exhausting all available administrative remedies, she sought review of the Administration's determination in federal court. The parties consented to proceed before a magistrate judge, who granted summary judgment in favor of the defendant. We reverse the district court judgment and remand the case to the agency for further proceedings.
 
 
 3
 * Hubbard-Davis based her application for SSI on physical and mental limitations. The physical limitations include: severe diabetes, hypertension, arthritis in her hands and feet, obesity, and a heart condition. Administrative Law Judge Richard Boyle concluded that the medical evidence presented at the hearing supported these physical impairments and limited her to sedentary jobs with a sit/stand option. This determination is not challenged.
 
 
 4
 Hubbard-Davis' also claimed that she met the SSA listing requirements for mental retardation. In finding that she did not, ALJ Boyle discussed the results of two psychiatric evaluations Hubbard-Davis participated in prior to the administrative hearing. The first was administered by Dr. Theresa Risolo in September 1992. It indicated that Hubbard-Davis' intellectual functioning was in the mentally retarded range, and that Dr. Risolo believed she met the SSA Listing criteria for Mental Retardation. This conclusion was based on the results of Hubbard-Davis' IQ test: verbal IQ 66; performance IQ 59; full scale IQ 60. Dr. Risolo stressed that Hubbard-Davis is functionally illiterate, has deficits in both long and short term memory, and is completely unable to screen out distractions. Dr. Risolo also reported that Hubbard Davis had Major Depression.
 
 
 5
 The second evaluation was administered approximately 17 months later by Dr. Alice Bernstein. Dr. Bernstein concluded that Hubbard-Davis suffered from Borderline Mental Retardation. She based this conclusion on the results of an IQ test she administered to Hubbard-Davis in April 1994: verbal IQ 72; performance IQ 75; fill scale IQ 73. Dr. Bernstein noted: "In interpreting the claimant's scores, it should be recalled that she took this same test one and a half years ago. The recency of this testing creates the possibility that performance on some subtests may have improved because of practice or familiarity of the particular items." Dr. Bernstein also diagnosed Hubbard-Davis as having Psychogenic Pain Disorder resulting from her depression, and noted that her reading and conceptual skills were limited.
 
 
 6
 Drs. Risolo and Bernstein also evaluated Hubbard-Davis' ability to perform work-related activities. The doctors were in substantial agreement in this area. Specifically, both indicated that she was seriously restricted in her ability to deal appropriately with the public, maintain concentration, and deal with work-stress. They also agreed that she was somewhat limited in her ability to interact with supervisors and co-workers. Further, they agreed that she was seriously restricted in her ability to understand, remember and then carry out both complex instructions and detailed but uncomplicated instructions. Additionally, Dr. Bernstein believed that Hubbard-Davis was seriously limited in her ability to use her judgment and function independently (Dr. Risolo's form did not list these areas for evaluation).[1]
 
 
 7
 A vocational expert testified at the administrative hearing. The ALJ asked whether jobs exist that a person of Hubbard-Davis' age, education and work experience could perform assuming the person was functionally illiterate, and could only perform sedentary work with a sit/stand option involving simple tasks in a low stress environment. The ALJ defined "low stress environment" as one involving no contact with the general public and no "production lines." The vocational expert testified that there were approximately 1,000 packing jobs and about 2,500 assembly jobs available for a person with the limitations indicated. In answer to a question from Hubbard-Davis, the VE stated that someone seriously limited in their ability to concentrate would not be able to perform these jobs because they would be unable to meet their production requirements.
 
 
 8
 The ALJ denied Hubbard-Davis' request for benefits, concluding that she was not disabled. He based this conclusion on his finding that she was in the borderline mental retardation range, thereby failing to satisfy the criteria of the 12.05C Listing. Further, he found that there were jobs in the economy that someone with her characteristics could perform. Hubbard-Davis exhausted her administrative remedies and then filed an action for judicial review in federal court. The district court entered summary judgment in favor of the defendant. Hubbard-Davis appeals.
 
 II
 
 9
 An individual is entitled to disability benefits under the Social Security Act if she can establish that she is disabled; that is, unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). This appeal involves the third and fifth steps of the familiar five-part analysis used to determine whether an applicant is disabled under the Act. See Brewer v. Chater, 103 F.3d 1384, 1391 (7th Cir.1997) (complete explanation of five-step framework used to determine eligibility for SSI); 20 C.F.R. § 416.920(b)-(f). At the third level, the ALJ must determine whether the claimant's condition meets or exceeds an impairment listed in 20 C.F.R. pt. 404, subpt. P. app. 1 ("Listing"). 20 C.F.R. § 416.920(d). If it does, she is entitled to SSI; if it does not, the inquiry continues. At the fifth step, the ALJ must determine whether the claimant, in light of her age, education, job experience, and residual functional capacity, is capable of performing work that exists in the national economy. 20 C.F.R. § 416.920(f). A claimant's residual functional capacity is what she can do despite her mental and physical limitations. Fox v. Heckler, 776 F.2d 738, 744 n. 3 (7th Cir.1985). If the ALJ finds that the claimant is able to work, the application is denied; if not, the application must be granted.
 
 III
 
 10
 Our review of the ALJ's findings is deferential. The ALJ's findings are conclusive if supported by substantial evidence. Brewer, 103 F.3d at 1390. "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). In making a substantial evidence determination, we review the entire administrative record, but we do not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the ALJ. Brewer, 103 F.3d at 1390. However, this does not mean that we will rubber-stamp an ALJ's decision. Ehrhart v. Secretary of Health and Human Servs., 969 F.2d 534, 538 (7th Cir.1992).
 
 
 11
 First, Hubbard-Davis challenges the ALJ's conclusion that she did not meet the criteria of Listing 12.05(C). That listing provides that a person is mentally retarded, and therefore disabled under the Act, if she has "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of functioning."
 
 
 12
 ALJ Boyle, crediting Dr. Bernstein's report, found that Hubbard Davis' IQ scores exceeded those in the listing and concluded that she was not disabled on this basis. The only reason he gave for discrediting Dr. Risolo's report was that he found it "very difficult to believe that a person ... could increase her scores by 16 points [in] 17 months ... if true mental retardation were present."[2] However, Dr. Bernstein provided the only evidence in the administrative record on this point: she indicated that a "practice effect" may have impacted Hubbard-Davis' performance.
 
 
 13
 An ALJ may not substitute his own judgment for that of an expert. Rohan v. Chater, 98 F.3d 966, 970 (7th Cir.1996) ("[A]s this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). Moreover, an ALJ may not disregard evidence when there is no other evidence contradicting it. Sample v. Shalala, 999 F.2d 1138, 1143 (7th Cir.1993) (an ALJ's disbelief of a claimant does not qualify as substantial evidence). It appears, however, that ALJ Boyle did both. He substituted his judgment for that of Dr. Bernstein's (the doctor whose report he said he credited) by disregarding her statement that the practice effect may have increased some of Hubbard-Davis' IQ scores, even though there was no evidence in the administrative record contradicting this statement.
 
 
 14
 Additionally, an "ALJ must minimally articulate his reasons for crediting or rejecting evidence of disability." Scivally v. Sullivan, 966 F.2d 1070, 1076 (7th Cir.1992). ALJ Boyle gave no reason for rejecting Dr. Bernstein's statement as to the practice effect. Further, his only reason for crediting Dr. Bernstein's report over Dr. Risolo's was his subjective belief, unsupported by evidence in the record, that the practice effect had no influence on Hubbard-Davis's test scores and that a person who is truly mentally retarded could not increase her scores by the amount Hubbard-Davis apparently did. As stated above, a subjective belief, unsupported by the evidence does not constitute substantial evidence. See Rohan, 98 F.3d at 970-71 ("[The claimant] is entitled to a decision based on the record rather than a hunch.").
 
 
 15
 On appeal, Hubbard-Davis also asserts that the AIJ's conclusion at step five was not supported by substantial evidence because the vocational expert's testimony was based on a faulty hypothetical. Specifically, she claims that ALJ Boyle did not include her inability to concentrate in the hypothetical, and when her attorney amended the hypothetical to include this limitation the vocational expert stated that no jobs existed that she could perform.
 
 
 16
 ALJ Boyle found that Hubbard-Davis had moderate deficiencies in her ability to concentrate. Again, he gave no reason for rejecting the findings of Drs. Risolo and Bernstein that Hubbard-Davis was seriously limited in her ability to concentrate. Rather, he conducted his own interpretation of Hubbard-Davis' IQ subtest scores (the same ones that Dr. Bernstein indicated may have been impacted by the practice effect) and concluded that she was only moderately limited in her ability to concentrate. Therefore, the finding that Hubbard-Davis has only moderate difficulty concentrating was not supported by the evidence purportedly relied upon by ALJ Boyle.
 
 
 17
 Moreover, even if ALJ Boyle adequately supported his finding that Hubbard-Davis was only moderately limited in her ability to concentrate, the vocational expert's testimony on how this limitation impacted the availability of jobs in the national economy was ambiguous. It is clear from the questions posed by ALJ Boyle that he intended the hypothetical to include a limitation on any jobs involving time pressure based on his finding that Hubbard-Davis had moderate difficulty concentrating. Specifically, he repeatedly stated that the job must have "no production lines" and "no production requirements." The vocational expert then testified that someone with Hubbard-Davis' limitations could perform assembly or packing jobs. However, in response to a question from Hubbard-Davis' attorney, he also testified that even these jobs had production requirements. It appears as though the vocational expert did not take into account the ALJ's admonition of "no production lines," and, therefore, that the vocational expert's testimony did not provided substantial evidence for AU Boyle's conclusion that job exist that Hubbard-Davis could perform.
 
 
 18
 "[W]e cannot uphold a decision by an administrative agency ... if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir.1996). Although this is a close case because the evidence in the record could support AU Boyle's decision, the evidence he reported relying upon and the reasons he gave for relying upon that evidence do not build an adequately accurate and logical bridge. Therefore, we REVERSE the district court judgment and REMAND the case to the Social Security Administration for further proceedings.
 
 
 
 [1]
 The administrative record contains psychological evaluations (or comments on Hubbard-Davis' mental functioning) by other doctors, but ALJ Boyle relied only on the reports by Drs. Risolo and Bernstein in making his determination. Therefore, we will not consider them
 
 
 [2]
 ALJ Boyle made apparent errors in his decision regarding Hubbard-Davis' IQ scores. He wrote that she received a score of 56 in verbal IQ on her 1992 test when actually she received a score of 66. Moreover, it is difficult to understand which scores he compared in determining that she had increased her score by 16 points. He may have been comparing her 1992 full scale score (60) to her 1994 full scale score (75), although if this is the case he got the math wrong. Had he been comparing the incorrect 1992 verbal score (56) to her 1994 verbal score (73) the difference would have been 17 points, had he been comparing the correct 1992 verbal score (66) to the 1994 verbal scores (73) the difference would only have been 7 points. Finally, if he was comparing the two performance scores the difference would have been 13 points