**Donna L. HINCHER, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. 2:04 CV 00011.**

United States District Court, W.D. Virginia, Big Stone Gap Division.

March 30, 2005.

Joseph E. Wolfe, Wolfe, Williams & Rutherford, Norton, VA, for Plaintiff.

Julie C. Dudley, Assistant United States Attorney, Roanoke, VA, and Donna Cal-

vert, Regional Chief Counsel, and Mona M. Bennett, Assistant Regional Counsel, Office of the General Counsel, Social Security Administration, for Defendant.

## OPINION

JONES, Chief Judge.

In this social security case, I remand the case to the Commissioner to take additional testimony from a vocational expert.

### I. Background.

Donna L. Hincher filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claims for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") benefits under titles II and XVI of the Social Security Act, 42 U.S.C.A. §§ 401–433, 1381–1383d (West 2003 and Supp.2004) ("Act"). Jurisdiction of this court exists pursuant to 42 U.S.C.A. §§ 405(g) and 1383(c)(3).

My review is limited to a determination as to whether there is substantial evidence to support the Commissioner's final decision. If substantial evidence exists, this court's "inquiry must terminate," and the final decision of the Commissioner must be affirmed. *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir.1966). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Id.*

Hincher applied for benefits on February 2, 2001, alleging disability since January 23, 2001. Her claim was denied at the initial and reconsideration levels of review. On March 9, 2002, an administrative law judge ("ALJ") vacated the reconsideration determination and remanded Hincher's claim to the Virginia state agency for further evaluation. The claim was again denied on July 9, 2002. Hincher received a hearing before an ALJ on December 5, 2002. By decision dated January 14, 2003, the ALJ found that the plaintiff was not disabled within the meaning of the Act. The Social Security Administration's Appeals Council denied review, and the ALJ's opinion constitutes the final decision of the Commissioner.

The parties have briefed the issues, and the case is ripe for decision.

### II. Facts.

Hincher was forty-three years old at the time of the ALJ's decision. (R. at 40.) She has a ninth grade education and has worked as a sewing machine operator, a tuning machine operator, and a screen printer. (R. at 40, 272.) Hincher claims disability due to depression, nervousness, stress, asthma, shortness of breath, pain in her lungs and hands, high blood pressure, weakness, and dizziness.

The record includes medical evidence from Stokes Reynolds Memorial Hospital; Stokes Family Health Center; the North Carolina Department of Public Health; St. Mary's Hospital, Outpatient Clinic; R. Michael Moore, M.D.; and Robert Spangler, Ed.D. The record also contains a consultative examination by Jack K. Cox, II, M.D.; and Physical Residual Functional Capacity Assessments ("PRFCs") and Psychiatric Review Technique Forms by state agency physicians.

Based upon the evidence, the ALJ determined that the plaintiff is unable to return to her past relevant work, but has the residual functional capacity ("RFC") to perform a significant range of light work, as defined in the regulations. Based upon the testimony of a vocational expert ("VE"), the ALJ found that there existed a significant number of jobs in the national economy that the plaintiff could perform.

## III. Analysis.

Hincher asserts that the ALJ's opinion is not supported by substantial evidence. Specifically, she advances three arguments: that the ALJ (1) failed to give sufficient weight to the opinion of her treating physician, Dr. Moore; (2) should have found her mental and breathing impairments to be more limiting; and (3) erred by relying on an incomplete hypothetical question to the VE about her breathing impairment. I reject the plaintiff's first two arguments, but agree with the third.

### A

Hincher argues that the ALJ failed to give sufficient weight to the opinion of her treating physician, Dr. Moore. For the following reasons, I find this argument to be without merit.

It is the duty of the ALJ to evaluate all medical evidence and to determine what weight to accord such evidence. *See* 20 C.F.R. §§ 404.1527, 416.927 (2004). The ALJ is entitled to give less weight to an opinion or any portion of the evidence which is not supported by or is otherwise inconsistent with the other evidence in the record. *See id.* §§ 404.1527(d)(3)-(4), 416.927(d)(3)-(4). The ALJ's determination as to the weight to be assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged up "specious inconsistencies," *Scivally v. Sullivan*, 966 F.2d 1070, 1076–77 (7th Cir.1992), or has not

given good reason for the weight afforded a particular opinion. *See* 20 C.F.R. § 404.1527(d). Generally, the ALJ must give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2004). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir.1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir.1992)).

Dr. Moore began treating Hincher prior to January 23, 2001, her alleged onset date. Between February 2000 and April 2002, he diagnosed her with anemia, asthma, hypertension, emphysema, and anxiety. (R. at 23, 150–52, 335–36.) Dr. Moore prescribed anxiety medication, and suggested that Hincher avoid stress and quit her job. (R. at 23.) Dr. Moore opined that Hincher is able to lift only ten pounds, should never stoop, bend, or climb, and is limited in her walking, and concluded that her impairments prevent her from working.

■ After carefully considering all the evidence on the record, including Dr. Moore's opinions about both Hincher's mental and breathing impairments, the ALJ thoroughly explained his reasons for discounting Dr. Moore's opinion.[1] Rejecting Dr. Moore's conclusions was permissible.

---

1. The ALJ explained,

   [w]hile ... Dr. R. Michael Moore has indicated on several occasions that the claimant is unable to work, the record does not contain objective or clinical findings which would justify his conclusions.... [H]is opinions are not supported by the evidence in the record.... [H]is own treatment records fail to describe severe symptoms related to a respiratory or mental problem. Dr. Moore evidently based his opinions on the

   claimant's complaints and not on the objective evidence in the record. On four occasions, Dr. Moore stated that the claimant is capable of lifting up to ten pounds and on one occasion, he found that the claimant could lift up to 20 pounds. However, on the same date of these opinions he opined that the claimant had been advised to quit her job and that she will be unable to work at the end of the treatment period.
   (R. at 25.)

Dr. Moore's assessment of Hincher's ability to do work-related activities was not consistent with his objective clinical findings. Dr. Moore's reports do not describe any anxiety or asthma-related symptoms that would prevent Hincher from working. Indeed, his reports do not describe Hincher's anxiety-related symptoms in any detail; they merely indicate that she is anxious.

Furthermore, Dr. Moore's treatment was limited. There was no indication in Dr. Moore's records that Hincher's anxiety or asthma-related symptoms could not be controlled with appropriate treatment. Dr. Moore prescribed medication for Hincher's anxiety but did not refer Hincher to counseling or for psychiatric treatment. He prescribed medication, inhalers, and nebulizers for Hincher's asthma and, on several occasions, even indicated that Hincher's physical abilities were "ok." (Def's Mot. Summ. J. at 12 (citing R. at 151, 344, 349, 353).)

The ALJ's skepticism towards Dr. Moore's opinions and his resolution of the conflicting medical evidence was well within his authority.

### B

Next, Hincher contends that the ALJ should have found her mental and breathing impairments more limiting. For the following reasons, I find this argument to be without merit.

It is the duty of the ALJ, and not the reviewing court, to make findings of fact and to resolve conflicts in the evidence. *See King v. Califano*, 599 F.2d 597, 599 (4th Cir.1979). So long as those findings and conclusions are supported by substantial evidence, I must affirm the final decision of the Commissioner. *Laws*, 368 F.2d at 642.

In this case, the ALJ found that Hincher has an anxiety disorder and borderline to average intelligence. He found that her emotional problems mildly restrict the activities of daily living and social functioning and cause moderate difficulties in maintaining concentration, persistence, or pace, but determined that Hincher retains "the residual functional capacity to perform unskilled, light exertional work." (R. at 24.)

The ALJ's written opinion clearly shows that he reviewed Hincher's mental health records in detail, including a consultative examination by Dr. Cox, medical reports from Dr. Moore, a psychological evaluation by Dr. Spangler, intake interview notes from Discovery Counseling and from Frontier Health, and assessments made by two state agency psychologists. (R. at 21–24, 26.)

As already discussed, the ALJ discounted Dr. Moore's opinion. The ALJ also rejected the opinions of Rochelle Roberts, B.A., who evaluated Hincher at Frontier Health, and of the intake examiner at Discovery Counseling. (R. at 25–26.) Roberts opined that Hincher "is unable to work due to physical problems as well as depressive ... and anxiety ... symptoms" and that she has a GAF of fifty. (R. at 25–26.) The ALJ found that her opinion was not supported by medically acceptable clinical evidence, was not consistent with the other substantial evidence of record, and did not provide a detailed, longitudinal picture of Hincher's health. (*Id.*) Furthermore, the ALJ noted that Roberts is not a physician, psychiatrist, or psychologist. (R. at 25.) The Discovery Counseling intake examiner opined that Hincher has a GAF of fifty-three, but that opinion was based on Hincher's own complaints, and was inconsistent with the examiner's own diagnoses. (R. at 26.) In addition, the Discovery Counseling examiner is not a physician, psychiatrist, or psychologist. (*Id.*)

The ALJ rejected the opinions of the two state agency psychologists, as well. Both had indicated that Hincher is "moderately limited in her activities of daily living, [and has] difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence, or pace." (R. at 26.) The ALJ found these opinions to be based only on the claimant's self-reported symptoms, and not on the objective evidence in the record. (*Id.*)

Additionally, the ALJ found Hincher's allegations regarding her limitations not to be credible. Her claim that she is unable to perform the activities of daily living is inconsistent with the objective evidence in the record. (R. at 25.) Hincher had failed to take her medications as prescribed, despite her own testimony that medication controls her symptoms. (R. at 25–26.) She first sought treatment by a counselor or psychiatrist only upon the advice of her attorney, and then did not keep her follow-up appointments, despite the therapist's indication that major improvement would come from counseling. (R. at 26, 23–24.) The next time Hincher sought psychiatric treatment, she again did so upon the advice of her attorney—Hincher's treating physician never referred her for psychiatric treatment. (*Id.*)

The ALJ relied most heavily on the findings of Drs. Milan and Spangler when concluding that Hincher's emotional problems only mildly restrict her activities of daily living and social functioning and only produce "mild to moderate difficulties in maintaining concentration, persistence or pace." (*Id.*) R.J. Milan, Ph.D., reviewed Hincher's records and completed a Psychiatric Review Technique form. (R. at 380.) He opined that Hincher has only mild limitations, and no severe mental impairment. (Def.'s Mot. Summ. J. at 7 (citing R. at 380–90).) Robert Spangler, Ed.D., evaluated Hincher at the request of her attorney. (R. at 355.) He administered an intelligence test and opined that Hincher has a "satisfactory ability to perform most work activities." (Def.'s Mot. Summ. J. at 6 (citing R. at 357).) He diagnosed borderline to low average intelligence and nicotine dependence. (*Id.*)

Although he rejected the opinions of the state agency psychologists, the ALJ did note that his conclusion as to Hincher's mental impairment is consistent with their findings. This is true. Dr. Tenison, one of the psychologists, opined that Hincher has "moderate limitations in maintaining concentration, persistence, or pace and mild limitations in social functioning and activities of daily living." (Def.'s Mot. Summ. J. at 8 (citing R. at 403–13).) Dr. Jennings, the other psychologist, opined that Hincher has only moderate limitations. (*Id.* (citing R. at 423–33, 439–41).) The ALJ's conclusion is also consistent with the opinion of consultative physician Dr. Cox, who concluded that Hincher's "mental status examination was normal," and with that of psychiatrist Dr. Balaicuis, who noted minor depression and anxiety, but found Hincher to be "doing rather well." (R. at 21, 23–24.)

The record in this case contains contradictory evidence as to Hincher's mental impairment. The ALJ properly weighed and analyzed the evidence, resolving those conflicts. Accordingly, I find that the ALJ's determination regarding Hincher's mental impairment is supported by substantial evidence.

■ Hincher also argues that the ALJ should have found her breathing impairment more limiting. The ALJ concluded that Hincher "has obstructive pulmonary disease (asthma and bronchitis)...." (R. at 24.) In light of these impairments, the ALJ gave Hincher "the benefit of doubt in determining that she is limited to light exertion that does not require being around dust or other respiratory irritants

and exposure to temperature extremes." (*Id.*)

As already discussed, the ALJ discounted Dr. Moore's opinion. With the exception of that opinion, the remainder of the evidence on the record is consistent with the ALJ's findings. Dr. Cox found only "occasional inspiratory wheezes" and "moderate obstructive airway disease" during his consultative examination, and concluded that Hincher's breathing impairment would respond "excellent[ly]" to bronchodilators. (R. at 21–22.) Pulmonologist Dr. Smiddy, who evaluated Hincher at the request of Dr. Moore, found "a borderline obstructive defect," emphysema, and old scarring. (R. at 22.) He advised Hincher to stop smoking. An X ray at St. Mary's Hospital showed no cardiopulmonary disease. Both Dr. Williams and Dr. Hays, who conducted PRFCs, found that Hincher retained the RFC to perform light work in the absence of respiratory irritants. Dr. Hays noted that Hincher's symptoms are "for the most part" controlled with medication alone. (R. at 452.) Accordingly, I find that the ALJ's determination regarding Hincher's breathing impairment is supported by substantial evidence.

### C

Finally, Hincher contends that the ALJ failed to pose the proper hypothetical question to the VE about her breathing impairment. For the following reasons, I agree, finding that the ALJ failed to set forth and describe all of Hincher's limitations. Accordingly, I will remand the case to the Commissioner to take additional evidence from the VE.

■ Where, as here, a claimant demonstrates the presence of a nonexertional impairment, the Commissioner must produce a VE to testify that, despite the claimant's combination of exertional and nonexertional impairments, she retains the

ability to perform specific jobs which exist in the national economy. *Grant v. Schweiker,* 699 F.2d 189, 192 (4th Cir. 1983). The testimony of the VE must be based upon consideration of all the evidence of record and in response to a proper hypothetical question that fairly sets out all of a claimant's impairments. *Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir.1989). In other words, the Commissioner may not rely upon the answer to a hypothetical question if the hypothesis fails to fit the facts. *See Swaim v. Califano,* 599 F.2d 1309 (4th Cir.1979).

In this case, the ALJ posed the following hypothetical question:

> Q: I'd ask you to assume a woman of the claimant's height, weight, education and work background. I ask you to assume that she has the residual functional capacity for light work activity. I ask you to assume that she must avoid activities around dust and other respiratory irritants and exposure to temperature extremes because of a respiratory impairment. And ... I ask you to assume that she is intellectual in the low average range. Are there any jobs that exist in the regional or national economy that this person could perform? I have one other ... limitation ... [e]motional disorder with mild to moderate restrictions regarding her ability to perform work-related activities.

. . . . .

> Q: If I find that the claimant's emotional disorder places greater than moderate restrictions on her ability to perform work-related activities, could she do these jobs?

(R. at 539–40.)

■ Hincher's specific complaint relates to the ALJ's failure to indicate in his question that she uses a breathing apparatus. Hincher asks "How is an individual with

such a breathing impairment and using a breathing machine every four hours, supposed[d] to sustain gainful activity... ? Would this interfere with the ability to perform her duties at work?" (Pl.'s Mot. Summ. J. at 11.)

The ALJ should have included information about Hincher's use of a nebulizer[2] in his hypothetical question. Hincher's need to use a nebulizer during the workday is substantiated by the record. The ALJ noted that Dr. Moore first prescribed nebulizers on October 24, 2000, and that Hincher's "symptoms are controlled with ... nebulizers." (R. at 22, 25.) The record also reveals that Dr. Smiddy prescribed Atrovent, a drug administered by nebulizer, to be taken four times a day. (R. at 368, 370.) State agency physician Dr. Williams noted Hincher's use of the nebulizer in his PRFC. (R. at 397.) In addition, the ALJ was aware of Hincher's use of the nebulizer from a previous hearing, the transcript of which was included in the record. (R. at 504–27.) At that hearing, Hincher testified that each nebulizer treatment takes approximately twenty-five minutes. (R. at 513–14.)

The ALJ's questions to the VE did not properly ensure that the expert knew what Hincher's abilities and limitations are, as is required by the Fourth Circuit. *See Walker*, 889 F.2d at 51. The need to further develop the evidence as to Hincher's use of a nebulizer is additionally supported by the VE's own testimony at Hincher's prior hearing.

VE: I looked at that, and I think, I think that there's a challenge there. I think that [in] some of these jobs it would possible to—[at] some of the jobs she could actually take the nebulizer

with her, counter clerk and telephone answering. But it would have an effect, yet.

ATTY: You heard her explanation of the side effects of the nebulizer that for a period of about an hour after treatment with the nebulizer ... she's extremely nervous and jittery and is unable during that period of time to focus and [it] actually affects, I guess her memory on a temporary basis. Do you actually think that a person could take the medication—probably would have to be twice in an 8 hour period, of about 25 minutes durations, and if she had side effects as she testified to for a period of about an hour at a time, would such a person still be able to take the treatments and do the jobs that you talked about?

VE: It could, it could be. It would differ with different people. I've seen people use nebulizers and function in secretarial capacities and answer the phone and file and do some pretty responsible things, so it could.

ATTY: This is, of course, sometimes the side effects of the medications can affect people differently, I guess.

VE: Correct. And my answer is, it could.

.        .        .        .        .

VE: Yeah, yes, it would depend on the degree. And [that] one becomes accustomed to a side effect and can deal with it, is also a factor in, in any medication. I believe that when people take medication over a period of time, they

---

**2.** A nebulizer is a machine that administers inhaled medications. An air compressor delivers a stream of medicated air to the patient's lungs through a mouthpiece or mask. Inhalation of the medication takes ten to fifteen minutes. U.S. Nat'l Library of Med. and the Nat'l Insts. of Health, *Nebulizer Use*, Medline Plus Medical Encyclopedia (October 27, 2004), *at* http://www.nlm.nih.gov/medlineplus/ency/presentations/100201_1.htm.

have different abilities to adapt. Now, it may go either way.

(R. at 523–24.)

I cannot simply assume that the employers offering the type of work that Hincher can perform would allow her to take the breaks necessary to use her nebulizer. *See Eback v. Chater*, 94 F.3d 410, 412 (8th Cir.1996) (requiring specific testimony from the VE that the cited jobs would routinely offer employees breaks during which the claimant could use her nebulizer). Nor can I assume that the VE's earlier testimony in this case adequately explored the impact Hincher's use of a nebulizer would have on the types of jobs she can perform—the VE identified a different group of jobs for which Hincher is qualified at the January 5, 2001, and the December 5, 2002, hearings.[3]

It is true, as the Commissioner points out, that Dr. Williams knew Hincher used the nebulizer and still opined that she was capable of performing light work. The Commissioner suggests that this opinion is sufficient to support the ALJ's determination because "state agency physicians ... are trained in evaluating medical findings and their impact on a claimant's RFC." (Def.'s Mot. Summ. J. at 13.) However, whether Hincher's use of a nebulizer would reduce the number of jobs available to her is not a question for the state agency physician, but one for the VE.

Because the VE's testimony failed to fully explore the effect Hincher's use of a nebulizer has on the number of jobs in the national economy that the plaintiff can perform, consistent with her RFC, age, education and work experience, I must find that the ALJ's opinion is not supported by substantial evidence. *See Walker*, 889 F.2d at 50–51 (holding that a hypothetical question must fairly set out all the claimant's impairments to be relevant to or helpful for the disability determination).

*IV. Conclusion.*

For the foregoing reasons, the parties' motions for summary judgment will be denied and the case will be remanded for further administrative consideration and development consistent with this opinion.

An appropriate final judgment will be entered.

---

**3.** At the January 2001 hearing, the VE stated that she considered Hincher's use of the nebulizer, but concluded that Hincher could work in hand packaging or in some assembly jobs, or as a telephone answering clerk, sandwich maker, greeter, server, or sorter. (R. at 521–22.) The VE further testified that 9,500 such jobs were available in the region, and one million in the nation. At the December 2002 hearing, the VE testified that Hincher could work as a waiter, counter clerk, inventory clerk, hand packer, nonpostal mail clerk, information clerk, and sorter. (R. at 540.) The VE further testified that 25,500 such jobs were available in the region, and 2.75 million in the nation.